**The below described is SIGNED.**



**Dated: March 26, 2015**



**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>Bryan John Taylor,<br><br>        Debtor.<br><hr><br>Zions First National Bank,<br><br>        Plaintiff,<br><br>v.<br><br>Bryan John Taylor,<br><br>        Defendant. | Bankruptcy Number: 12-21044<br><br>Chapter 7<br><br>Judge R. Kimball Mosier<br><br><br><br>Adversary Proceeding No. 12-2186 |

---

### FINDINGS AND CONCLUSIONS IN SUPPORT OF JUDGMENT
### EXCEPTING DEBT FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(2)(A)

---

Zions First National Bank (Zions) thinks Bryan John Taylor's (Taylor) debt to it should

be excepted from discharge.  The Court agrees with Zions.  After considering the evidence,

including facts as stipulated to or admitted by the parties, as adduced from testimony, or as

established by the introduction of exhibits, and after assessing the credibility of the witnesses,

considering the arguments of counsel, and conducting an independent review of the law, the

Court makes the following Findings of Fact and Conclusions of Law.  These Findings of Fact

and Conclusions of Law constitute the Court's findings of fact and conclusions of law under

Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rule of

Bankruptcy Procedure 7052, and incorporate by reference any oral rulings made on the record

during the trial the Court conducted on this matter on December 8, 9, and 10, 2014, January 6,

2015, and February 2, 2015.[1]

## I. JURISDICTION

The Court's jurisdiction over this adversary proceeding is properly invoked pursuant to

28 U.S.C. § 1334(b) and § 157(a) and (b). This is a core proceeding within the meaning of 28

U.S.C. § 157(b)(2)(I), and the Court may enter a final order.  Venue is appropriate under 28

U.S.C. § 1409.

## II. FINDINGS OF FACT

In early 2007, Taylor's neighbor told him about an investment opportunity with Luxe

Automotive Group, Inc. (Luxe).  When Taylor contacted Luxe he spoke with Tamio

Stehrenberger (Stehrenberger), who told him that Luxe had a program that would utilize Taylor's

personal credit and pay him a handsome profit (Luxe Program). Taylor was given some written

materials (Information Packet) that described the Luxe Program. In concept, the Luxe Program

---

[1] Any of the findings of fact herein are deemed, to the extent appropriate, to be
conclusions of law, and any conclusions of law herein are similarly deemed to be findings of fact,
and they shall be equally binding as both.

was not complicated.[2]  An individual would use his or her personal credit to purchase a luxury

car that Luxe would lease from that individual for its business.  Luxe would make monthly

payments to the individual in an amount that exceeded the monthly payments the individual was

required to make on the car loan by approximately 20%.  If an individual purchased several

luxury cars, the monthly payments from Luxe may have been sufficient to pay the cost of the

individual's own luxury car, plus some additional profit.  Taylor decided to participate in the

Luxe Program.

Stehrenberger told Taylor that there were a number of banks and lending institutions that

may finance his car purchases and that he would help Taylor obtain the financing. Stehrenberger

assured Taylor that all of the banks and lending institutions were aware of the Luxe Program and

that Taylor's cars would be used in the Luxe Program (Luxe Assurances).  Taylor filled out loan

applications, including one for Zions, and gave them to Stehrenberger.  With Stehrenberger's

help, Taylor was able to purchase six cars financed by six different financial institutions.  On

August 7, 2007, Taylor financed the purchase of a 2005 Bentley Continental through Wells Fargo

Bank.  On August 9, 2007, Taylor financed the purchase of a 2006 Mercedes-Benz CLS55 AMG

through Key Bank, a 2007 Mercedes-Benz S550 through JPMorgan Chase Bank, and a 2006

Lamborghini Murcielago Roadster (Lamborghini) through Zions.  On August 10, 2007, Taylor

financed the purchase of a 2006 BMW M5 through HSBC and a 2005 Maserati Quattroporte

through E-Loan.  Taylor immediately leased each of these cars to Luxe.

---

[2] Although the concept was not complicated, there was no evidence that the Luxe
Program was a sound business model.

Dylan Ence (Ence) was employed by Zions as a "relationship manager" in its Executive Banking Department.  Stehrenberger contacted Ence regarding a car loan for Taylor.  Ence was already familiar with Stehrenberger because Ence had been involved with two sizable loans Zions made to Stehrenberger in May and June 2007.  On one or more occasions, Ence and Stehrenberger had also met socially.  Ence agreed to act as loan officer for Taylor's loan (Loan), and Stehrenberger gave him Taylor's loan application, tax returns, and other documentation.

Zions handled the Loan application as a consumer loan in accordance with its standard practices and procedures for consumer car loans.  Zions verified the purchase price, investigated the standing of the dealership that sold the Lamborghini, verified Taylor's monthly income, pay stubs, and tax returns, determined Taylor's creditworthiness and credit score, and determined Taylor's debt service ratio based upon the debt obligations disclosed in the Loan application. Zions determined the loan-to-value ratio at 116.99% based upon the low book value of the Lamborghini.  Based upon Taylor's monthly income and credit score, Zions calculated Taylor's debt service ratio to be 47.60%, which was in line with Zions' policy.  If Zions had known that Taylor intended to obtain other loans for other luxury cars or that the Lamborghini was intended for business use,  Zions' standard practice would have required a substantially different procedure to approve the Loan.

During the underwriting phase of the Loan application, Zions' underwriter, Sally Garcia (Garcia), became aware of "multiple recent credit inquiries" on Taylor's credit report.  Garcia testified that it was not uncommon to see multiple recent credit inquiries on a borrower's credit report involving a car loan because prospective buyers would often "shop" various lending institutions to obtain the best terms for their loan.  Ence was tasked with investigating why the

4

multiple recent credit inquiries appeared on Taylor's credit report.  Garcia recorded a note in her

file regarding Ence's follow-up on Taylor's multiple recent credit inquiries that stated: "no new

per Dylan auto inquiries and mortgage inquiry in March."  Although Zions was aware of the

multiple recent credit inquiries, it was not aware that Taylor intended to obtain other loans to

purchase other luxury cars simultaneously with the Loan.

Prior to the Loan closing date, Taylor did not speak with Ence or any other Zions

representative, and all questions regarding the Loan application were directed to, and were

answered by, Stehrenberger.  Ence visited Luxe's showroom on at least one occasion prior to the

Loan closing date and observed multiple luxury vehicles on the showroom floor.  Stehrenberger

testified that he gave Ence an Information Packet when Ence visited the Luxe showroom.  Ence

did not recall ever receiving an Information Packet.  Other than Stehrenberger's testimony, which

is contradicted by Ence's testimony, there is no evidence that Ence or Zions became aware of the

nature and purpose of the Luxe Program prior to the Loan closing date.  Even if Ence had

become aware of the Luxe Program, there is no evidence that he was aware of Taylor's intention

to use a vehicle financed by Zions in the Luxe Program.

On August 9, 2007, Taylor signed a Promissory Note in the principal amount of

$330,472.00, a Consumer Security Agreement (Security Agreement), and a Disbursement

Request and Authorization (Disbursement Request). The Security Agreement represented: (1)

that without Zions' prior written consent, Taylor would not sell, lease, transfer, borrow against or

otherwise dispose of any of Taylor's rights in the Lamborghini unless and until Zions is paid in

full; (2) that Taylor would keep the Lamborghini at his home address except for routine travel;

and (3) that Taylor would not do anything that requires applying for a certificate of title for the

5

Lamborghini in another state.  The Disbursement Request represented that the primary purpose of the Loan was for personal, family, or household purposes or personal investment.

Taylor testified that because of the Luxe Assurances, he believed that he was not deceiving or defrauding Zions and that he had hidden nothing from Zions, but Taylor did nothing to determine if Zions was aware of the Luxe Program and that he intended to participate in the Luxe Program.  Taylor did nothing to determine if Zions was aware that he intended to immediately lease the Lamborghini to Luxe, that he would not use the Lamborghini for his personal use, and that he would not keep the Lamborghini at his home address.  In short, Taylor did nothing to determine whether Zions was aware that the Lamborghini would be used in the Luxe Program or that Zions knew that the representations in the Loan documents were not accurate.

Taylor does not dispute that at the time he entered into the Loan with Zions, he intended to lease the Lamborghini to Luxe, and that shortly after purchasing the Lamborghini, he leased it to Luxe. Taylor also does not dispute that he did not keep the Lamborghini at his home address and that it was taken out of state before it was repossessed by Zions.  The evidence is that Ence and Zions did not become aware of the nature of Taylor's business relationship with Luxe, or of Taylor's plans to lease the Lamborghini to Luxe, until well after the Loan had closed.

The Loan went into default after Taylor failed to make his August 2009 payment.  Zions took possession of the Lamborghini in October 2009, the Lamborghini was sold, and the net proceeds of the sale were applied to the Loan.  When the complaint in this case was filed, the outstanding balance on the Loan was $141,017.40.  The Promissory Note provided that Taylor would pay Zions the reasonable attorney's fees and expenses that Zions may incur to collect it.

6

## III. CONCLUSIONS OF LAW

To except a debt from discharge under 11 U.S.C. § 523(a)(2)(A),[3] a "creditor must prove the following elements by a preponderance of the evidence: [1] [t]he debtor made a false representation; [2] the debtor made the representation with the intent to deceive the creditor; [3] the creditor relied on the representation; [4] the creditor's reliance was [justifiable]; and [5] the debtor's representation caused the creditor to sustain a loss."[4] Taylor does not dispute that he made false representations to Zions, and he does not dispute that the false representations caused Zions to sustain a loss. The only questions remaining are whether Taylor made the false representations with the intent to deceive Zions, whether Zions relied on the false representations, and whether Zions' reliance on the false representations was justifiable.

### A. Intent to Deceive

Taylor contends that he did not intend to deceive Zions because Zions knew that the Lamborghini was going to be leased to Luxe. Although Zions' actual knowledge relates more to Taylor's justifiable reliance defense, if Zions was aware of the Luxe Program and that Taylor was going to lease the Lamborghini to Luxe, perhaps the Court could find that Taylor did not have the intent to deceive Zions. But the weight of the evidence is that Zions did not know about the Luxe Program and did not know that Taylor was going to lease the Lamborghini to Luxe.

Taylor also contends that he did not intend to deceive Zions because he was acting in good faith and believed, notwithstanding the false representations he made in the Security

---

[3] All subsequent statutory references are to Title 11 of the United States Code unless otherwise indicated.

[4] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996) (citation omitted).

Agreement and Disbursement Request, that Stehrenberger had made Zions fully aware of the Luxe Program and Taylor's intended participation therein.  Although not thoroughly articulated by Taylor, implicit in his contention is the argument that he should not be held responsible for false representations, if any, made by Stehrenberger on his behalf.

The Court is not required to accept a debtor's self-serving statement that he acted in good faith and had no intent to deceive.  An "intent to deceive 'may be inferred from the totality of the circumstances.'"[5]  When determining intent, "[t]he court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations."[6]  Willful blindness will not allow a debtor to avoid liability for his actions.[7]  A finding of willful blindness "allows the [trier of fact] to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him."[8]

---

[5] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 791 (10th Cir. 2009) (quoting *Young*, 91 F.3d at 1375).

[6] *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000) (citing *Visotsky v. Woolley (In re Woolley)*, 145 B.R. 830, 836 (Bankr. E.D. Va. 1991), *aff'd in part and vacated in part*, 35 F. App'x 826, 2002 WL 1044832 (10th Cir. May 24, 2002)(unpublished)).

[7] *Farmers & Merchants State Bank v. Perry (In re Perry)*, 448 B.R. 219, 226-27 (Bankr. N.D. Ohio 2011) ("'[W]illful blindness' does not provide a defense to an action brought under § 523(a)(2)(A), and may instead be used as a factor indicative of fraud." (citing *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 164 (Bankr. N.D. Ohio 2003))).

[8] *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991). "[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060, 2070-71 (2011).

Taylor's intent to deceive Zions is easily inferred from the totality of the circumstances. Within a four-day period Taylor financed the purchase of six expensive luxury cars with six separate financial institutions, including Zions, and did not disclose any of the other five transactions to Zions. Taylor leased these cars to Luxe, expecting to receive a profit for nothing more than the use of his personal creditworthiness. Taylor made affirmative representations that were inconsistent with his intended use of the Lamborghini and did nothing to verify that Zions was aware that the representations were false. Taylor consciously and intentionally avoided any mention of these facts to Zions.

At a minimum, Taylor remained willfully blind to the fact that Zions was unaware of the falsity of his representations. Taylor's claim that he did not intend to deceive Zions is dependent on his belief that Zions knew his written representations were false, which in turn is based on the Luxe Assurances. It is undisputed that Taylor counted on Stehrenberger to communicate with Zions on his behalf, and relied on Stehrenberger's disclosures to Zions regarding the use of the Lamborghini. Although Taylor had depended on Stehrenberger to facilitate the Loan, at the time Taylor signed the Loan documents, he did nothing to verify what representations, if any, Stehrenberger had made on his behalf and made no effort to determine if Zions was aware that the representations he made in the Loan documents were false.

If Stehrenberger made any misrepresentations to Zions on Taylor's behalf, those misrepresentations are imputed to Taylor through the principal/agent relationship.[9] But in this

---

[9] *See, e.g., Sachan v. Huh (In re Huh)*, 506 B.R. 257, 271-72 (9th Cir. BAP 2014) ("While the principal/debtor need not have participated actively in the fraud for the creditor to obtain an exception to discharge, the creditor must show that the debtor knew, or should have known, of the agent's fraud.").

9

case, there is little evidence that Stehrenberger made any false representations to Zions. The facts strongly suggest that Stehrenberger made a false representation to Taylor when he advised Taylor that Zions knew the Lamborghini would be leased to Luxe and used in the Luxe Program. But the fact that Taylor may have been defrauded by Stehrenberger does not absolve him of his own fraud upon Zions.

The Court does not find Taylor's testimony that he had no intent to deceive Zions to be credible. The Court cannot countenance Taylor's "pure heart, empty head" defense in this case. There was nothing, other than the Luxe Assurances, that gave Taylor a basis for believing Zions was aware that the Lamborghini would be used in the Luxe Program. The Loan documents Taylor signed were false. Taylor intended that Zions rely upon the representations in the Loan documents as presented and consequently, Taylor had the requisite intent to deceive Zions.

**B. Reliance**

The standard of reliance required under § 523(a)(2)(A) is not reasonable reliance, but the less demanding standard of justifiable reliance.[10] "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'"[11] Nevertheless, a creditor may not ignore clear indications that a representation is untrue.[12] "[U]nder the 'justifiable' test, . . . the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before

---

[10] *Field v. Mans*, 516 U.S. 59, 74-75 (1995).

[11] *Id.* at 70 (quoting Restatement (Second) of Torts § 540 (1976)).

[12] *Attorneys' Title Guaranty Fund, Inc. v. Wolf (In re Wolf)*, 519 B.R. 228, 247 (Bankr. N.D. Ill. 2014).

entering into it,"[13] and justifiable reliance "is satisfied if the falsity of the representation relied

upon is not patent from 'a cursory examination or investigation.'"[14]  But a creditor's duty to

investigate is not triggered "unless the falsity of the representation would have been readily

apparent."[15]  The justifiable reliance inquiry is a subjective one.[16]  Therefore, "[i]n determining

whether a creditor's reliance was justifiable, a court should . . . examine 'the qualities and

characteristics of the particular plaintiff, and the circumstances of the particular case, rather than

applying a community standard of conduct to all cases.'"[17]

　　　　Zions is a local bank that offers both consumer and business loans. The Loan was handled

by Zions as a personal loan and not as a business loan because of the representations Taylor made

to Zions.  Zions reviewed the Loan consistent with its standard practice.  It verified income and

liabilities.  When its underwriter became aware of multiple recent credit inquiries on Taylor's

credit report prior to the closing date of the Loan, Ence was tasked with investigating those

multiple recent credit inquiries.  Ence's investigation resulted in a note appearing in Garcia's

files that indicated nothing was out of the ordinary: "no new per Dylan auto inquiries and

---

[13] *Riebesell*, 586 F.3d at 792 (quoting *Field*, 516 U.S. at 71).

[14] *Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 686 (10th Cir. BAP 2006) (quoting *Field*, 516 U.S. at 71); *see also Islamov v. Ungar (In re Ungar)*, 633 F.3d 675, 679 (8th Cir. 2011) ("The [*Field*] Court emphasized that creditors could not turn a blind eye where a patent falsity could be determined by a cursory examination or investigation." (citation and internal quotation marks omitted)); *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010) ("Justifiable reliance . . . requires only that the creditor did not blindly rely upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." (citation and internal quotation marks omitted)).

[15] *Ojeda*, 599 F.3d at 717.

[16] *Riebesell*, 586 F.3d at 791.

[17] *Id.* at 792 (quoting *Field*, 516 U.S. at 71).

mortgage inquiry in March." Furthermore, the evidence is that it is not uncommon to see multiple

recent credit inquiries on a borrower's credit report involving a car loan. In short, there was

nothing in the Loan application or accompanying documents to put Zions on notice that the

representations contained in the Loan application and accompanying documents were anything

other than the truth. Zions' examination of Taylor's documents included Ence's review of the

documents as well as Garcia's review. Zions' review went well beyond a cursory examination

and revealed no reason to deny the Loan application. Therefore, Zions' reliance was justifiable.

## C. Damages

Zions seeks a judgment of $141,017.40 plus accrued interest from May 4, 2012 as well as

reimbursement of the reasonable attorney's fees and expenses it has incurred as allowed pursuant

to the Promissory Note. The Promissory Note, dated August 9, 2007 and signed by Taylor,

provides for an award of the reasonable attorney's fees and expenses, including such fees and

expenses for bankruptcy proceedings, incurred by Zions in collecting on the Promissory Note in

the event of a default. Section 523(a)(2)(A) prevents the discharge of any debt respecting money,

property, services, or credit that the debtor has "fraudulently obtained, including treble damages,

attorney's fees, and other relief that may exceed the value obtained by the debtor."[18]

Accordingly, Zions will be awarded a non-dischargeable judgment of $141,017.40 plus accrued

interest from May 4, 2012 and the reasonable attorney's fees and expenses it has incurred as

allowed pursuant to the Promissory Note.

---

[18] *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998).

12

## IV. CONCLUSION

Taylor made false representations to Zions with the intent to deceive.  Zions relied upon Taylor's false representations, and Zions' reliance was justifiable.  Taylor's false representations caused Zions to sustain a loss.  Zions has proved the elements of a cause of action under § 523(a)(2)(A) by a preponderance of the evidence and consequently is entitled to a judgment under § 523(a)(2)(A) excepting from Taylor's discharge his debt to Zions in the amount of $141,017.40 plus accrued interest from May 4, 2012 and the reasonable attorney's fees and expenses Zions has incurred as allowed pursuant to the Promissory Note. Plaintiff shall prepare a proposed judgment consistent with this ruling and a supporting affidavit respecting accrued interest and attorney's fees and expenses.

_____END OF DOCUMENT_____

_____oOo0oOo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **FINDINGS AND CONCLUSIONS IN SUPPORT OF JUDGMENT EXCEPTING DEBT FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(2)(A)** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

| | |
|---|---|
| Steven T. Waterman | waterman.steven@dorsey.com, bingham.karen@dorsey.com, ventrello.ashley@dorsey.com |
| Kami L. Peterson | Kami.Peterson@zionsbancorp.com, Angela.Stephenson@zionsbancorp.com, Deanne.Koecher@zionsbancorp.com |
| Edward J. Stone | edward@stonelawfirm.net, michael@stonelawfirm.net |
| Robert Fugal | robfugal@birdfugal.com, candace@birdfugal.com |

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

• *None.*